**Glenn P. MAULDING, Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 15512.

United States Court of Appeals
Ninth Circuit.

May 29, 1958.

**58**

T. N. Gore, Jr., Fairbanks, Alaska, Edgar Paul Boyko, Anchorage, Alaska, for appellant.

George M. Yeager, U. S. Atty., Paula A. Tennant, Asst. U. S. Atty., Fairbanks, Alaska, for appellee.

Before HEALY, POPE, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

Glenn P. Maulding, a trailer dealer in Fairbanks, Alaska, was tried and convicted on a charge of feloniously and wrongfully converting to his own use the sum of $2,500, the property of the Bank of Fairbanks. It was alleged in the indictment that this sum had been received by Maulding for the sale of a house trailer. The trailer, according to the indictment, was the property of the bank, pursuant to a bill of sale from Maulding to the bank. It was further alleged that the bank had given Maulding custody of the trailer "in trust." The described acts were alleged to have been done in violation of § 65–5–62 of the Alaska Compiled Laws Annotated 1949, entitled "Embezzlement by Bailee."[1]

On this appeal, Maulding contends that, under the undisputed facts, it must be held, as a matter of law, that no relationship of bailor and bailee existed between the bank and appellant, and that the statute relied upon is therefore not applicable. On this ground, he specifies as error the denial of his motion for judgment of acquittal made at the close of the evidence offered by the government, and the denial of his motion for a new trial.

Appellee has moved to dismiss the appeal on the ground that the motion for judgment of acquittal was waived, and that denial of a motion for a new trial is not reviewable in this court.

Appellant waived the motion for judgment of acquittal made and denied at the close of the government's case, when he thereafter produced evidence in his own behalf. Mosca v. United States, 9 Cir., 174 F.2d 448. This being the case, we cannot now review the action of the trial court in denying that motion.[2]

---

1. Section 65–5–62 of the Alaska Compiled Laws Annotated 1949, reads in part as follows:

   "That if any bailee, with or without hire, shall embezzle, or wrongfully convert to his own use, or shall secrete, with intent to convert to his own use, or shall fail, neglect, or refuse to deliver, keep, or account for, according to the nature of his trust, any money or property of another delivered or intrusted to his care or control, and which may be the subject of larceny, such bailee, upon conviction thereof, shall be deemed guilty of embezzlement * * *. And every mortgagor of personal property having possession of property mortgaged shall be deemed a bailee within the provision of this section."

2. No similar motion was made at the close of all the evidence. Such a motion was made on the fifth day following the return of the verdict. But such a motion can then be made only as a renewal of a similar motion made and denied at the close of all the evidence. Rule 29(b), Federal Rules of Criminal procedure, 18 U.S.C.A. There being no such motion which could be renewed, the motion made after return of the verdict was ineffective for any purpose. Mosca v. United States, supra. This defect was apparently understood by all concerned, for the trial judge did not deal with this motion in his decision denying the concurrently-made motion for a new trial. Nor is there any specification of error involving this post-verdict motion for judgment of acquittal.

■ The trial court, however, considered the legal question as to whether a relationship of bailor or bailee existed as having been raised by the motion for a new trial. That court dealt with the question at length in its comprehensive decision denying that motion. United States v. Maulding, D.C., 147 F.Supp. 693. Such denial was specified as error. This court will review the ruling on a motion for a new trial for error of law or abuse of discretion. Cavness v. United States, 9 Cir., 187 F.2d 719, 722. We therefore conclude that the question is properly before us. The motion to dismiss the appeal is denied.[3]

The following undisputed facts are to be considered in determining whether a bailor-bailee relationship existed between the bank and Maulding, within the meaning of the statute. In order to finance the acquisition of trailers for purposes of sale, Maulding entered into a "Floor Plan Agreement" with the Bank of Fairbanks. This agreement was not introduced in evidence. Thereafter, in May, 1952, according to an invoice introduced in evidence, Manhattan Trailer Sales, of California, sold the trailer in question to the bank for a purchase price of $2,510.39. The invoice indicates that the trailer was shipped to the bank. Maulding prepaid the freight.

On June 16, 1952, the bank "floored" the trailer with Maulding after he executed a trust receipt with attached promissory note and a bill of sale. The trust receipt, as indicated on its face, was issued pursuant to the Uniform Trust Receipts Law of Alaska, chapter 40, S.L.A.1951. In this instrument, Maulding acknowledged receipt of the trailer, designated "Trust Property." The trailer was stated to have an "invoice price" of $2,510.39, and a "minimum sale price" of $3,750.

The trust receipt also constitutes an acknowledgment by Maulding (designated "Trustee") that a "security interest" in the trailer (called "Trust Property") remains in the bank (designated "Entruster") "until payment in full by the Trustee of the note annexed hereto." The receipt contains a number of conditions and agreements. Maulding agreed to return the trailer "on demand and in good order and unused." He agreed to hold the trailer as "trustee" for the bank, but with the right to exhibit and sell it "for the account" of the bank for cash and for not less than the minimum price specified in the instrument. Maulding, as "trustee," also agreed, in the event of such a sale, (1) to notify the bank promptly, (2) to hold the proceeds "in trust" for the bank, and (3) to deliver such proceeds promptly to the bank.

Maulding also agreed, in this instrument, that he would not rent, mortgage, pledge, encumber, use for demonstration, operate, or otherwise use the trailer. He further agreed that he would make no sale of the trailer "except as trustee for the Entruster," and that "a security interest" in the trailer "remains and is fully preserved in the Entruster until payment of the note. * * *" The trust receipt contains a clause, quoted in the margin, making reference to the "Floor Plan Agreement."[4]

The promissory note signed by Maulding, which was attached to the trust re-

3. Since the question appellant raises may be considered under his specification of error directed to the motion for a new trial, we need not determine whether we could notice it, in any event, under the "plain error" rule. Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.A.

4. "This Trust Receipt is issued under the Floor Plan Agreement, and any amendments thereto, dated June 16, '52, and executed and delivered by the Trustee to the Entruster and is subject to the pro-visions thereof. Upon the occurrence of any of the events specified in the said Agreement, the Entruster is entitled to repossess the Trust Property without demand and otherwise in the manner and with the effect provided in said Agreement. If the Entruster shall find it necessary to protect or enforce its rights hereunder by legal proceedings or otherwise, the undersigned agrees to pay promptly all taxes, costs, charges, expenses and disbursements including reasonable attorneys' fees."

ceipt, is for the sum of $2,500, payable on demand to the order of the bank. It contains a clause referring to the Floor Plan Agreement, quoted in the margin.[5] The bill of sale from Maulding (denominated "vendor") to the bank is in the usual form for such instruments.

On May 9, 1953, Maulding sold the trailer to Glenn and Janette Hanneman for the sum of $2,800 in cash. Maulding used all of the proceeds of this sale for other personal and business obligations. He did not notify the bank of the sale or account for, or deliver to, the bank any of the proceeds. In September or October, 1953, the bank learned of the sale. Maulding was not then in Alaska.

■ A relationship of bailor-bailee arises when the owner, while retaining general title, delivers personal property to another for some particular purpose upon an express or implied contract to redeliver the goods when the purpose has been fulfilled, or to otherwise deal with the goods according to the bailor's directions. Earhart v. Callan, 9 Cir., 221 F.2d 160, 163.

The parties and the trial court have assumed that the determinative question here is whether Maulding held the trailer as a bailment within the meaning of some such general definition of the term.

But Maulding was not charged with, or convicted of, embezzling the trailer. He was tried and convicted on a charge of converting to his own use $2,500 of the sum received by him from the sale of that trailer.[6]

This may have been an embezzlement of funds received as agent for another,[7] and may be punishable as such under § 65–5–61 of the Alaska Compiled Laws Annotated 1949. Conversion of the funds (which was charged), as distinguished from conversion of the trailer (which was not charged), was not, however, an "embezzlement by bailee," under § 65–5–62, unless the $2,500 was being held as a bailment.

■ As indicated by the definition set out above, personal property can become the subject of a bailment only if the owner, while retaining general title thereto, delivers it to another for some particular purpose. The bank had neither possession nor ownership of the $2,500 prior to its acquisition by Maulding. The bank, therefore, was not a bailor, and Maulding was not a bailee of that money.

It follows that, if the indictment is to be read literally as charging embezzlement by bailee of the money and not the trailer, the judgment of conviction cannot stand.

We will proceed, however, to consider what the result would be if the indictment is read as charging embezzlement of the trailer by bailee. This is the light in which the parties and the trial court dealt with the case. The prime question then becomes one of determining whether a bailor-bailee relationship existed between the bank and Maulding concerning the trailer.

As before indicated, the transaction was intended to give application to the "Uniform Trust Receipts Law," enacted in Alaska in 1951. In all relevant respects, the Alaska statute is identical

---

5. "This Note is issued under the Floor Plan Agreement, and any amendments thereto, dated June 16, 1952, and delivered by the undersigned to the above-named payee and is subject to the provisions thereof. Upon the occurrence of any of the events specified in the said Agreement, the principal hereof may become forthwith due and payable in the manner, upon the conditions and with the effect provided in said Agreement."

6. In three other similar criminal cases which have been called to our attention, the defendant was charged with embezzlement, larceny, or conversion of the entrusted property, and not of the misappropriated proceeds of the sale. See People v. Moses, 375 Ill. 336, 31 N.E.2d 585; State v. Edwards, 345 Mo. 929, 137 S.W.2d 447; Commonwealth v. Williams, 93 Pa.Super. 92.

7. See Coney v. State, 100 Tex.Cr.R. 380, 272 S.W. 197.

with the Uniform Trust Receipts Act adopted and approved in 1933 by the National Conference of Commissioners on Uniform State Laws.[8]

In the act, an "entruster" (here the bank) is defined as the person who has taken a "security interest" in goods, documents, or instruments under a trust receipt transaction. Purchase-money chattel mortgages and conditional sales vendors are specifically excluded from the term "entruster." Section 1(3). A "security interest" is defined in § 1 (12) as follows:

> "(12) 'Security interest' means a property interest in goods, documents or instruments, limited in extent to securing performance of some obligation of the trustee or of some third person to the entruster, and includes the interest of a pledgee and title, whether or not expressed to be absolute, whenever such title is in substance taken or retained for security only."

■ A trust receipt transaction, within the meaning of the act, occurs when the entruster or any third person delivers to another ("trustee"), for the purpose described in the act, goods, documents, or instruments in which the entruster has, or is to acquire for new value, a security interest, under a writing designated a "trust receipt" describing the goods, documents, or instruments, and reciting that the entruster will retain or acquire a security interest therein. Section 2(1, 2). One of the purposes for which such a transaction may be entered into is to permit the trustee to sell the goods, documents, or instruments described in the trust receipt. Section 2(3) (a).

Where the trust receipt gives the trustee liberty of sale and he sells to a buyer in the ordinary course of trade, such buyer takes free of the entruster's security interest in the goods sold. Section 9(2) (a). An entruster who retakes possession under the terms of the trust receipt may, after default by the trustee, sell the goods, documents, or instruments "for the trustee's account." The trustee receives any surplus from the proceeds of such a sale, after payment of expenses and satisfaction of the trustee's indebtedness. Section 6(3) (b).

All provisions of the trust receipt and attached promissory note involved in this case are consistent with these statutory provisions. The bill of sale which Maulding gave the bank is absolute in form and, considered separately, is not consistent with a normal trust receipt transaction. Such instruments, however, are to be read in context with the entire transaction, and as only confirmatory of the intention of the parties to give to, or retain for, the entruster a security interest.[9]

This brief description of the nature of trust receipt transactions is enough to indicate that there are substantial differences between such a transaction and a bailment.

■ A bailor has a general property interest in the property; an entruster has only a security interest. A bailee has no property interest in the bailment. Thus, upon repossession and sale by the bailor, the bailee has no interest in the proceeds other than as compensation for services performed while holder of the property. The trustee in a trust receipt transaction, on the other hand, usually has a property interest in entrusted property which entitles him to the surplus proceeds of any sale, upon repossession by the entruster.

8. Handbook of the National Conference of Commissioners on Uniform State Laws (1933), pages 88–89; 9C Uniform Laws Annotated, pages 220, 231–272.

9. Davis v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393; General Finance Corp. v. Krause Motor Sales, 302 Ill.App. 210, 23 N.E.2d 781. In Bank of America National Trust & Savings Ass'n v. Nat. Funding Corp., 45 Cal.App.2d 320, 114 P.2d 49, it was held that the entruster had only a lien, though he held the registration of legal title to the automobile.

No debtor-creditor relationship exists between a bailor and bailee, and the bailee may return the property to the bailor without incurring liability. On the other hand, in a trust receipt transaction, a debtor-creditor relationship always exists between a trustee and his entruster. The trustee cannot discharge his obligation by returning the property.[10]

There is a wide divergence of judicial opinion as to the true nature of trust receipt transactions. This is, perhaps, largely due to the fact that many courts have sought to identify such transactions with one or another of the common-law forms of security transactions. Thus, courts have found such transactions to be more like conditional sales than chattel mortgages, and vice versa; more like conditional sales than pledges; more like chattel mortgages than pledges; more like bailments than conditional sales, or chattel mortgages, or pledges.[11] The result has been a considerable divergence of judicial view as to the nature of trust receipt transactions. This divergence of view, however, is less noticeable in cases decided since the widespread enactment of the Uniform Trust Receipts Act.

The fact is that trust receipt transactions possess some of the characteristics of conditional sales, chattel mortgages, and bailments with authority to sell. In substantial respects, however, a trust receipt transaction does not entirely meet the test of any of these other security forms. It makes use of a different and independent form of security device.[12] We have stated above the prime differences between a trust receipt transaction and a bailment. The differences between such a transaction and conditional sales, chattel mortgages and pledges, are not here relevant.

Appellee cites Holcomb & Hoke Mfg. Co. v. N. P. Dodge Co., 123 Neb. 142, 242 N.W. 367, as holding that the legal effect of the trust receipt there in question was to establish the relationship of bailor and bailee.

The Holcomb case so holds in a transaction quite similar to that now under consideration. But as authority for that conclusion, Holcomb cited, as its

---

10. The trial court considered that Maulding had no obligation to the bank unless he sold the trailer. In the court's opinion, it is stated: "Contrary to the contention of the defendant, it will be observed that the promissory note attached to the trust receipt in this case contains no such unconditional promise to pay, but becomes due only upon a sale of the property by the dealer or trustee, in which event he is obligated to deliver the proceeds of sale to the entruster; otherwise, to return such property." 147 F.Supp. at pages 696–697.

We do not so read the promissory note. It is payable "on demand." The note is made subject to the "Floor Plan Agreement," which is not in evidence. The trial court believed that the substance of this agreement is set forth in the "Conditions and Agreements," of the trust receipt. Assuming this to be true, we find nothing therein which undercuts the trustee's obligation to pay $2,500 "on demand," in the event the entruster chooses to rely upon the promissory note instead of securing possession of the trailer."

11. See the annotation of cases in 49 A.L. R. 282 et seq.; 87 A.L.R. 302 et seq.; 101 A.L.R. 453 et seq.; and 168 A.L.R. 359. Illustrative of what has just been said are In re Sweet's Estate, 224 Iowa 589, 277 N.W. 712; Ahrens Refrigerator Co. v. R. H. Williams Co., 176 Okl. 5, 54 P.2d 200; General Motors Acceptance Corp. v. Whiteley, 217 Iowa 998, 252 N. W. 779; and Maxwell Motor Sales Corp. v. Bankers' Mtg. and Securities Co., 195 Iowa 384, 192 N.W. 19, holding that a trust receipt transaction involves not a bailment, but a conditional sale. In McLeod-Nash Motors, Inc., v. Commercial Credit Trust, 187 Minn. 452, 246 N.W. 17, 87 A.L.R. 296, it was held that such a transaction involves not a bailment, but a chattel mortgage. On the other hand, Holcomb & Hoke Mfg. Co. v. N. P. Dodge Co., 123 Neb. 142, 242 N.W. 367; and Brown v. Billington, 163 Pa. 76, 29 A. 904, held that a trust receipt transaction involves a bailment and not a conditional sale.

12. As Professor Phillip W. Thayer has said, it is "an instrument *sui generis*." 16 Washington Law Review (1941) "Trust Receipts," pages 1, 12.

sole authority, General Motors Acceptance Corp. v. Hupfer, 113 Neb. 228, 202 N.W. 627.[13] In the latter case, however, the entruster retained full property interest in the automobiles, and the dealer had no authority to sell the property without the written release of the entruster upon payment of a stipulated sum. This was not a trust receipt transaction of the kind contemplated by the Uniform Act or by the parties in the instant case.

Appellee also cites Oil City Motor Co. v. C. I. T. Corp., 10 Cir., 76 F.2d 589, 104 A.L.R. 240, which announces a holding similar to that of the Holcomb case. The Oil City case involved a suit by an automobile dealer to recover for asserted usurious interest exacted of it in connection with trust receipt transactions. The court held that the entruster did not lend money, but only extended credit, with regard to which the statute concerning usury had no application. In reaching this conclusion, the court held that, under the transaction there involved, title to the automobiles vested in the financing agency with possession in the dealer as trustee. The dealer, it was held, had the privilege of acquiring title by making payment of the purchase price.

We do not undertake to pass upon that court's analysis of the transaction there under examination. It is clear, however, that if the analysis is correct, no trust receipt transaction, as contemplated by the Uniform Act, was involved. In transactions under the act, the dealer has the prime property interest in the goods, and the financing agency only a security interest.

It is our conclusion that the trust receipt transaction here in question did not create a bailor-bailee relationship between the bank and Maulding.[14] It follows that his conversion of the trailer which was the subject of the trust receipt could not be "embezzlement by bailee," within the meaning of the Alaska statute.

We therefore hold that it was error to deny the motion for a new trial. The form of relief which we must accord is to remand with direction to grant appellant a new trial. But appellee will perceive that, in view of the opinion herein expressed, the appropriate course is to move for dismissal of the indictment.

Reversed and remanded for further proceedings not inconsistent with this opinion.

Judge Healy heard the oral argument, but did not participate in the decision in this case.

---

13. Said the court (242 N.W. at page 369): "* * * It would appear unnecessary to determine where the weight of authority may be in other jurisdictions, as this court in the analogous case of General Motors Acceptance Corp. v. Hupfer, 113 Neb. 228, 202 N.W. 627 held a similar transaction not to constitute an absolute sale, mortgage, conditional sale, or lease, but to establish the relation of bailor and bailee. * * *"

14. This view accords with the opinion expressed by George B. McGowan in his book entitled "Trust Receipts," Ronald Press (1947), page 134.